1
2
3
4                              UNITED STATES DISTRICT COURT
5                            NORTHERN DISTRICT OF CALIFORNIA
6
7     EUGENE SCALIA,                                Case No.  19-cv-02103-DMR
8                    Plaintiff,
9             v.                                    ORDER ON DEFENDANT'S MOTION
                                                    FOR ISSUANCE OF LETTERS
10    INTERNATIONAL LONGSHORE AND                   ROGATORY
      WAREHOUSE UNION,
11                                                  Re: Dkt. No. 80
                     Defendant.
12
13            On April 18, 2019, Plaintiff Eugene Scalia, in his official capacity as the Secretary of the

14    U.S. Department of Labor ("DOL"), filed a complaint against Defendant International Longshore

15    and Warehouse Union ("ILWU") under Title IV of the Labor-Management Reporting and

16    Disclosure Act of 1959, 29 U.S.C. §§ 481-83 ("LMRDA").  [Docket No. 1.]  DOL filed an amended

17    complaint on August 30, 2019.  [Docket No. 28 ("FAC").]  DOL seeks a judgment invalidating

18    ILWU's September 2018 election of union officers and an order that ILWU conduct a new election

19    for those positions.  On June 5, 2020, ILWU filed a motion requesting that the court issue letters

20    rogatory to the Republic of Panama.  [Docket Nos. 80 ("Mot."), 84 ("Reply").]  DOL opposes.

21    [Docket No. 83 ("Opp.").]  The court held a hearing on August 27, 2020.

22            For the reasons stated below the motion is granted in part and denied in part.

23    I.      BACKGROUND

24            A.      Factual Background

25            ILWU represents approximately 44,500 workers in five U.S. states (California, Oregon,

26    Washington, Alaska, and Hawaii), as well as in Canada and Panama.  [Docket No. 33, First

27    Declaration of Robert Remar ("First Remar Decl.") ¶ 3.]  ILWU has dozens of affiliated locals and

28    divisions and holds officer elections every three years.  *Id.*  The elections are governed by the union

United States District Court
Northern District of California

1    election provisions of LMRDA and the Election Rules and Procedures in the ILWU Constitution.

2    *Id.* ¶ 4; *see* First Remar Decl., Ex. A, Appendix ("Rules").  As provided by the ILWU Constitution,

3    the Convention of the International is held every three years prior to officer elections.  *Id.* ¶ 8.

4    Affiliated locals elect delegates to the Convention, and the delegates nominate and elect two

5    candidates for each of the four titled officer positions: President, Vice President (Mainland), Vice

6    President (Hawaii), and Secretary Treasurer.  *Id.*

7                                1.        **2018 ILWU Election**

8            The 2018 election involved two political groups of candidates seeking to fill the four offices.

9    One group was led by Ray Familathe, the incumbent Vice President (Mainland), while the other

10   was headed by Willie Adams, the incumbent Secretary-Treasurer.  First Remar Decl. ¶ 18.  Several

11   years prior, Familathe had hired Greg Mitre to serve as the ILWU liaison for the two ILWU locals

12   in Panama: Panama Canal Pilots Union ("PCPU") and SINTRAPORSPA.  *Id.* ¶¶ 19-20.  These

13   locals obtained their affiliation with ILWU in 2012 and 2015, respectively, and together comprise

14   the Panama Canal Division.  *Id.* ¶ 20.  According to Robert Remar, legal counsel for ILWU,

15   communications between ILWU and the two Panama locals "have gone through or been facilitated

16   by Familathe and/or Mitre, including those concerning the 2018 ILWU election."  *Id.*  He avers that

17   Mitre "actively campaigned for the Familathe group during the 2018 election period."  *Id.*

18           ILWU held its 2018 Convention in Portland, Oregon, during the week of June 3, 2018.  First

19   Remar Decl. ¶ 21.  Prior to the Convention, most locals had submitted a list of their active members

20   in accordance with the Election Rules.  *Id.* ¶¶ 10, 22, *see* Rule 14.C(1) ("Within thirty (30) days

21   prior to the Convention, each affiliate shall submit to the International Secretary-Treasurer a listing

22   of its active members specifying name, last known home address, and membership book number, if

23   available.").  Membership lists are necessary in order to mail ballots to union members.  *See* First

24   Remar Decl. ¶ 27.  However, SINTRAPORSPA had not submitted a membership list and no

25   delegates from that local attended the 2018 Convention.  *Id.* ¶¶ 22, 24.

26           On June 6, 2018, Mitre emailed Familathe a list of names, which the email described as "the

27   list from the minister of labor of Panama the Sintraporspa union members."  First Remar Decl. ¶ 27;

28   *see id.*, Ex. C (email dated June 6, 2018 from Mitre to Familathe, with an attached list of names).

Mitre represented to ILWU attorney Remar that the list was SINTRAPORSPA's official list of current union members. *Id.* ¶ 28. Mitre and Londor Rankin, a representative of PCPU, also represented to the Convention delegates that the list was official. *Id.* Some delegates raised a concern about the accuracy of the list. *Id.* ¶ 28. Remar advised the Convention that under the Election Rules, a membership list submitted by a local is presumed to be valid, absent contrary evidence. *Id.* ¶ 29. However, because the eligibility of any member to vote can be challenged before the ballot count, it was decided that the ballots from Panama would be segregated to allow for candidates to raise challenges or objections to them based on election irregularities or violations. *Id.* ¶ 29. ILWU also requested that SINTRAPORSPA certify the accuracy of the list. [Docket No. 46, Second Declaration of Robert Remar, ("Second Remar Decl.") ¶ 5.] ILWU received the requested certification on August 8, 2018. *Id.* ¶ 7; *see id.*, Ex. P. The certification was signed by Rolando Jimenez, SINTRAPORSPA's Secretary-Treasurer. ILWU used the list provided by Mitre and certified by Jimenez to send ballots to members of SINTRAPORSPA.

The Panama Canal Division also proposed a modification to the mail ballot process to allow for mailing of ballots to two Panama post offices rather than to individual members' home addresses, since most people in Panama do not have home addresses or home delivery service. First Remar Decl. ¶ 25. Supporters of the Familathe group favored the proposal while supporters of the Adams group opposed it. *Id.* ¶ 26. ILWU ultimately adopted the proposal and incorporated it into the Election Rules for the 2018 Constitution. *Id.*

On July 23, 2018, Global Election Services ("GES") mailed out 44,695 ballots, including to the two Panama locals. First Remar Decl. ¶ 35. GES is the "outside agency hired to conduct the election under the supervision of the ILWU Election Procedures Committee [EPC]."[1] *Id.* ¶ 28. The ballots were due to be returned within 45 days, by September 6, 2018. *Id.* ¶ 35; *see* Rule 14.E (mandating a 45-day return period for ballots). Although the ballots were timely mailed, there were some delays in delivering the ballots through the post office and they did not arrive in the Panama

---

[1] ILWU's Constitution mandates that "[a]ll ILWU referendum elections shall be conducted by mail ballot with the assistance of an outside impartial, certified and licensed professional elections agency." Rule 14(A).

United States District Court
Northern District of California

United States District Court
Northern District of California

post offices until August 16, 2018, though possibly earlier.[2]  *Id.* ¶ 36.  On August 20, 2018, Mitre called GES to confirm that the Panama ballots had arrived, but he expressed concern whether there was sufficient time for voted ballots to be received in San Francisco by September 6, 2018, and whether additional postage was required (in addition to the pre-paid business return envelope already provided).  *Id.*  He was informed that there was sufficient time to return the voted ballots and that no additional postage was required.  *Id.*  On August 23, 2018, GES contacted the Panama postal service to request special handling in order to ensure on-time delivery of returned ballots.  *Id.*  The request was granted.  *Id.*  On August 31, 2018, SINTRAPORSPA official Lazaro Salas emailed GES and represented that he had shipped a box of voted ballots on August 23, 2018.  *Id.*  Remar represents that the August 31, 2018 email was the first he, the EPC, and the ILWU had heard of the ballots being collected and mailed together in a box.  *Id.* ¶ 37.

The ballot count was held on September 6, 2018.  First Remar Decl. ¶ 38.  Approximately 9,887 total ballots were received.  *Id.* ¶ 38.  GES representatives conducted the count, and no one else was permitted to handle or touch the ballots.  *Id.* ¶ 39.  The box from Panama contained about 1,078 voted ballots.  *Id.*  The ILWU Balloting Committee challenged and disqualified the box of ballots from Panama on the basis that the mailing method violated Election Rule 14.B, which provides that "no one other than the [outside election] agency shall collect or handle any mail ballots other than [the] member's own ballot."  Rule 14.B.  After excluding the Panama ballots, the tally showed that the Adams group of candidates received the most votes.  First Remar Decl. ¶ 40.

### 2.    Election Challenges

The election was challenged based on the disposition of the Panama ballots.  First Remar Decl. ¶ 41.  EPC held a four-day hearing on the challenges on October 1 through 4, 2018.  *Id.* ¶ 42.  In preparation for the hearing, EPC requested information on the balloting procedure from SINTRAPORSPA.  *Id.* ¶ 43.  Salas, the officer who had shipped the box of ballots, provided information about how the ballots were handled.  *Id.*  He represented that SINTRAPORSPA officials

---

[2] Salas informed ILWU that the ballots arrived in Panama between August 10, 2020 and August 14, 2020 but did not start to arrive at the Balboa post office until August 16, 2020, and some ballots arrived later.  First Remar Decl., Ex. K.

collected the ballots and bulk-mailed them in the box GES had received.  *Id.*; *see id.*, Ex. J (September 27, 2018 email from Salas).  During the hearing, GES presented the Panama ballots for viewing by the individuals present.  *Id.* ¶ 44.  Remar represents that he personally viewed the ballots and saw that the ballots were filled out with "near-identical penmanship and color ink" and "[e]very Panama ballot [he] saw from the bulk-mailed box was voted for the Familathe group in all races in the same color pen with the same type of markings."  *Id.* ¶ 45.  He also avers that the voted ballots from other locals within the ILWU "appear to have substantially more variety in who they voted for, whether they voted for all offices and how they filled in the ballot (i.e., darkened ovals versus "X" marks versus circling names)."  *Id.*  In contrast, the Panama ballots "looked like copies of each other."  *Id.*  The Balloting Committee found that the ballot collecting procedure in Panama violated Rule 14.B,[3] and therefore did not reach the issue of the ballots' "suspiciously uniform markings."  *Id.* ¶ 45.  EPC accordingly overruled the challenges to the disposition of the ballots.  *Id.* ¶ 46; *see id.*, Ex. L (EPC decision after hearing).  The challengers appealed the decision to the International Executive Board, which upheld EPC's decision.  *Id.* ¶ 47.

One of the challengers, Floyd Bryan, filed a complaint with DOL.  First Remar Decl. ¶ 47. According to Remar, Bryan was a "supporter of the Familathe group and a long-time friend of Ray Familathe and his wife, Cathy."  *Id.* ¶ 48.  ILWU informed DOL that the union wanted DOL to investigate whether there had been fraud in the handling of the Panama Ballots.  *Id.* ¶ 53.  Attorney Eleanor Morton represented ILWU during DOL's investigation.  [Docket No. 81, First Declaration of Eleanor Morton ("First Morton Decl.") ¶ 2.]  ILWU provided DOL with contact information for various officers and members of the Panama locals.  *Id.*  DOL then communicated with and interviewed several individuals in Panama about the 2018 election, membership eligibility, when the ballots arrived in Panama, whether return postage was required, and whether any eligible members did not receive a ballot.  *Id.* ¶ 4; *see id.*, Exs. D, E.  DOL also obtained documents

---

[3] According to Remar, the actions taken by the SINTRAPORSPA officers violated several other Election Rules, including Rule 14.E.7 (providing that ballot packets may not be sent to any official union location or to a union officer's office or home address) and Rule 14.E.13 (prohibiting union officers from requiring or requesting that members give their ballots to any officer).  First Remar Decl. ¶ 49.

United States District Court
Northern District of California

purporting to record the payment of union dues by members from Panama Ports and Serviestiba, S.A., companies that employ SINTRAPORSPA members as dockworkers.  *Id.*, Ex. G; *see* Mot. at 18.  In the motion now before the court, ILWU points to DOL's investigation of these Panama sources as a key reason to permit ILWU to take discovery from the same sources.

### B.        Claims and Defenses

On April 18, 2019, DOL filed the present case against ILWU, seeking to void the election results and require ILWU to conduct another election.  FAC ¶ 1.  DOL alleges that ILWU violated LMRDA by denying members of the Panama Canal Division a "reasonable opportunity to vote" by failing to provide "adequate safeguards to insure a fair election" in violation of sections 401(c) and 401(e) of LMRDA.  *Id.* ¶¶ 48-49; *see* 29 U.S.C. §§ 481(c), (e).  According to DOL, the ILWU's "voting instructions were not fully or accurately translated into Spanish and failed to adequately notify voters of constitutional rules that [ILWU] invoked to disqualify the ballots."  *Id.* ¶ 18.  For example, "[n]either the English nor the Spanish voting instructions notified members that [ILWU] would void ballots that were collected and mailed . . . within a larger shipping container."  *Id.* ¶ 17.  The international business reply envelope stated that there was "NO POSTAGE NECESSARY IF MAILED TO THE UNITED STATES," but did not have this message in Spanish.  *Id.* ¶ 19.

DOL alleges that ILWU also failed to adequately respond to other concerns raised regarding the voting process in Panama, including whether the delayed receipt of the ballots would permit members adequate time to vote and return the voted ballots and whether the pre-paid business reply envelope would be honored by the postal service in Panama.  FAC ¶¶ 20-25, 46-47.  DOL asserts that ILWU had notice as early as August 31, 2018 that the voted ballots were bulk-mailed and "failed to take reasonable steps in response, such as issuing those voters replacement (duplicate) ballots, distributing and collecting ballots in person, and extending the voting period."  *Id.* ¶¶ 25, 48.  According to DOL, ILWU also failed to mail ballots to approximately 608 SINTRAPORSPA members who were eligible to vote.  *Id.* ¶ 13.  DOL contends that ILWU's actions constitute a violation of LMRDA and that the proper relief is to declare the results of the 2018 ILWU election void and order ILWU to conduct a new election.

ILWU asserts that DOL is not entitled to any of the relief it seeks for at least five reasons:

United States District Court
Northern District of California

6

(1) ILWU complied with its Constitution and the law by using reasonable efforts to prepare the ballot mailing list, distribute ballots and collect them; (2) ILWU's methods for distributing ballots to Panama were based on the advice given it by the DOL; thus DOL has waived and/or is estopped from challenging ILWU's actions and/or the DOL's prosecution violates due process; (3) no alleged legal errors by ILWU affected the outcome of the election because fewer people in Panama were eligible to vote than the margin of victory for each office; (4) to the extent any Panama voters were denied the right to vote, the misconduct by Panama officials and/ or the Familathe group and its supporters interfered in the normal conduct of the election and were an intervening cause that prevents a finding that any actions of ILWU affected the outcome of the election; and (5) equity prohibits the relief DOL is seeking (*i.e.*, a re-run election with the resulting costs, resources, internal turmoil and instability imposed on ILWU, its members and candidates) as it would reward wrongdoing committed by the very group that filed the administrative complaint with DOL seeking a re-run of the election.

Mot. at 11; *see* Docket No. 30 ("Answer").

**C.     Requested Discovery**

ILWU moves the court to issue a letter rogatory to the appropriate judicial authority in Panama, requesting judicial assistance to obtain information and documents from several people and entities, including: SINTRAPORSPA; Salas, the SINTRAPORSPA Secretary of Defense; Jimenez, the SINTRAPORSPA Secretary-Treasurer; PCPU; Rankin, Raul Fueillet, and Alvarez Moreno, PCPU officers and 2018 Convention Delegates for the Panama Canal Division; and Panama Ports and Serviestiba, S.A., employers of SINTRAPORSPA members.  Mot. at 15-19; *see* Docket No. 117, Third Declaration of Eleanor Morton ("Third Morton Decl."), Ex. BB.

The requests seek information relating to membership and voter eligibility; the membership list submitted to the Convention; communications about the 2018 ILWU election and the use of general delivery of the ballots; communications from SINTRAPORSPA or its officers with any of the candidates, their supporters, or campaigns; communications with postal employees regarding the mailing of the ballots and return postage requirements; and SINTRAPORSPA's decision to collect ballots from members and bulk mail them.  *See* Third Morton Decl., Ex. BB.

**II.     DISCUSSION**

**A.     Letters Rogatory**

A letter rogatory is "a formal written request sent by a court to a foreign court" for the

1    purpose of obtaining evidence, including depositions and documents, in a pending action.  *Barnes*

2    *& Noble, Inc. v. LSI Corp.*, Case No. 11-cv-02709-EMC (LB), 2012 WL 1808849, at *1 (N.D. Cal.

3    May 17, 2012); *see also Optrics, Inc. v. Barracuda Networks, Inc.*, Case No. 17-cv-04977-RS

4    (TSH), 2019 WL 5485890, at *1 (N.D. Cal. Oct. 25, 2019) ("Parties may use letters rogatory to

5    'take evidence from a specific person within the foreign jurisdiction, including requests for

6    production of documents.") (internal quotation marks and citation omitted)).  The Federal Rules of

7    Civil Procedure provide for the taking of depositions within foreign countries through letters

8    rogatory.[4]  *See* Fed. R. Civ. P. 28(b)(1)(B) ("A deposition may be taken in a foreign country . . .

9    under a letter of request, whether or not captioned a 'letter rogatory' . . . .").  A court has inherent

10   authority to issue letters rogatory, and discretion in exercising that authority.  *Barnes & Noble, Inc*,

11   2012 WL 1808849, at *2.  When determining whether to exercise its discretion, "a court will

12   generally not weigh the evidence sought from the discovery request nor will it attempt to predict

13   whether that evidence will actually be obtained." *Asis Internet Servs. v. Optin Glob., Inc.*, Case No.

14   05-cv-05124-JCS, 2007 WL 1880369, at *3 (N.D. Cal. June 29, 2007).  Instead, "a court's decision

15   whether to issue a letter rogatory requires an application of Rule 28(b) in light of the scope of

16   discovery provided for by the Federal Rules of Civil Procedure." *Id.*

17          Where the requests appear to be prevented by the application of a foreign law, courts must

18   consider principles of international comity and perform a "particularized analysis of the respective

19   interests of the foreign nation and the requesting nation."  *Societe Nationale Industrielle*

20   *Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987) ("*Aerospatiale*");

21   *see*, *e.g.*, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) (rejecting a

22   foreign corporation's argument that state secrecy laws prohibited it from disclosing the information

23   ordered by the district court); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, Case No. 07-cv-5944-

24   SC, 2014 WL 5462496, at *4 (N.D. Cal. Oct. 23, 2014) (ordering foreign discovery despite a foreign

25   defendant's argument that compliance may subject them to criminal sanctions under the French

26

27   [4] The parties' briefing discusses the Inter-American Convention on Letters Rogatory and Additional
     Protocol ("IACAP"), but at the hearing all parties agreed that the court's authority to issue letters
28   rogatory arises under the Rules.  Accordingly, the court does not address arguments relating to the
     IACAP.

1    Blocking Statute); *Optrics, Inc.*, 2019 WL 5485890, at *1-*3 (granting motion to issue letters

2    rogatory where the foreign defendant argued the documents requested may be confidential under

3    Canadian law).

4         Here, DOL does not raise any specific concerns that the discovery requested would run afoul

5    of Panama law or principles of international comity.  Accordingly, the court analyzes the propriety

6    of the requests under the Federal Rules.

7         **B.      Rule 26 Analysis**

8         Federal Rule of Civil Procedure 26 provides:

9              Parties may obtain discovery regarding any nonprivileged matter that is
10             relevant to any party's claim or defense and proportional to the needs of the
               case, considering the importance of the issues at stake in the action, the
11             amount in controversy, the parties' relative access to relevant information,
               the parties' resources, the importance of the discovery in resolving the
12             issues, and whether the burden or expense of the proposed discovery
               outweighs its likely benefit.  Information within this scope of discovery
13             need not be admissible in evidence to be discoverable.

14   Fed. R. Civ. P. 26(b)(1).  "Rule 26(b) is liberally interpreted to permit wide-ranging discovery of all

15   information reasonably calculated to lead to discovery of admissible evidence." *Oakes v. Halvorsen*

16   *Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998).  The party resisting discovery "has the burden

17   to show that discovery should not be allowed, and has the burden of clarifying, explaining, and

18   supporting its objections." *Id*.

19        **1.      Relevance**

20        ILWU argues that information from Panama sources is highly relevant, both to DOL's

21   claims and to ILWU's defenses.  DOL disagrees.  It asserts that all of the requested discovery is

22   irrelevant because the only relevant evidence is what ILWU knew or reasonably should have known

23   before the September 2018 election and any evidence in Panama has no bearing on that issue.  *See*

24   Opp. at 18.  DOL does not provide authority for this restrictive theory of relevance.  DOL undertook

25   an investigation in Panama and its findings there formed the factual basis for its claims.  ILWU is

26   entitled to a fair opportunity to test DOL's factual conclusions.  In addition, even if ILWU violated

27   the LMRDA, the 2018 election can only be voided if ILWU's alleged unlawful conduct "may have

28

affected the outcome of the election."[5]  29 U.S.C. § 482(c)(2).  Therefore, whether ILWU's alleged misconduct had any effect on the election depends on what actually happened in Panama, not merely what ILWU knew or should have known in the weeks leading up to the election.  For the reasons stated below, the court finds that ILWU has established that the topics for which it requests discovery are all relevant to the claims and defenses in this case.  The court now examines the specific topics for which ILWU seeks Panamanian-based discovery.

### a.    Voter Eligibility

DOL alleges that "ILWU denied a reasonable opportunity to vote to approximately 608 Panama Division members who were not sent ballots despite paying dues or being on dues checkoff during the relevant time period."  FAC ¶ 47.  ILWU propounded interrogatories requesting factual support for that allegation.  *See* First Morton Decl., Ex. J (DOL's responses to ILWU's special interrogatories).  DOL responded:

> Defendant did not obtain records indicating which SINTRAPORSPA members were paying dues or on dues checkoff during the relevant time period in or around May 2018 when it compiled its mailing list for its election contractor.  In addition, a comparison between the Government List of members of SINTRAPORSPA used by ILWU to mail ballots to its members and the monthly dues checkoff reports for SINTRAPORSPA employers, PPC and Serviestiba, show that 608 SINTRAPORSPA members paid dues in May 2018 but were not sent a ballot because their names were not included on the Government List. Discovery is ongoing, and this response will be supplemented as necessary.

*Id.* According to ILWU, DOL's response shows that its claims rely in part on documents it obtained from Panama sources, including the dues records provided by SINTRAPORSPA employers.  Mot. at 11-12.  It argues that it has the right to investigate these documents and that only individuals in Panama could provide first-hand information about whether the records are "authentic, accurate and complete."  *Id.* at 12.

LMRDA requires that unions "take all reasonable steps to ensure that its members are given

---

[5] LMRDA also authorizes courts to void an election if the election was not held within the time period prescribed by statute, but DOL's claim does not rely on that provision.  *See* 29 U.S.C. § 482(c)(1).

United States District Court
Northern District of California

a fair opportunity to vote." *Dole v. Graphic Commc'ns Int'l Union, AFL-CIO, CLC*, 722 F. Supp. 782, 786 (D.D.C. 1989); *see also* 29 U.S.C. § 481(e); *Wirtz v. Local Union No. 1622, United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 285 F. Supp. 455, 464 (N.D. Cal. 1968). DOL argues that whether ILWU acted reasonably turns on whether it was "aware of or should have been aware of the possibility that members in the Panama Division were unable to vote" and took reasonable steps in response. Opp. at 16. However, it does not follow that the records of dues paying members are irrelevant to that inquiry. DOL's claim could only succeed if any Panama members were eligible to vote but could not because of ILWU's actions or failure to take actions. Whether eligible members were denied the opportunity to vote relies on which members were in fact eligible.[6] Further, as noted above, ILWU's election can only be voided if its alleged unlawful conduct may have affected the outcome of the election. If ILWU can show that at least some of the members listed on the employers' records were not in fact eligible to vote, then the number of members who were actually disenfranchised may not have been sufficient to change the election outcome.[7] *See* Mot. at 13. DOL cannot both rely on the lists it obtained from Panama sources and prevent ILWU from conducting its own discovery into whether those lists accurately show the number of eligible voters.

Accordingly, the information ILWU seeks from Panama sources regarding which members were eligible to vote is relevant to the issues in this case.

### b.    Ballot Mailing

The FAC alleges that that ILWU acted unreasonably when it failed to "mail ballots to Panama Division members in a manner that enabled each member to receive his or her ballot, mark

---

[6] DOL argues that ILWU is improperly seeking to "challenge those same eligibility lists they received [and] used at the time of the election." *See* Opp. at 20. This argument makes little sense. ILWU asserts that it was only obligated to use the certified list provided by the Panama Division to determine which members were eligible to vote. According to the interrogatory response, DOL's position is that other eligible members did not appear on that list and ILWU therefore denied those members a reasonable opportunity to vote. DOL (not ILWU) is putting at issue the eligibility of the members appearing on the employers' records.

[7] Even if, as DOL argues, ILWU should have "act[ed] upon its suspicions that the SINTRAPORSPA list was inaccurate," it is still relevant whether that violation may have affected the election. *See* Opp. at 20 n. 6.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the ballot, and return it by the September 6, 2018 ballot deadline." FAC ¶ 50. The parties agree

2    that the date(s) the ballots arrived in Panama is currently unknown, although the best information

3    seems to be that they were received sometime between August 11, 2018 and August 23, 2018.[8] *See*

4    First Remar Decl. ¶ 36. Contrary to DOL's position, the ballot arrival date is directly relevant to

5    DOL's allegation that ILWU failed to mail ballots "in a manner that enabled each member to receive

6    his or her ballot . . . and return it by the . . . ballot deadline." *See* FAC ¶ 50. The LMRDA requires

7    no less than fifteen days for the receipt of voted ballots. 29 U.S.C. § 481(e). If the ballots were

8    received in Panama as early as August 11, 2018, they will have arrived more than fifteen days before

9    the September 6, 2018 ballot deadline. If they were received after August 23, 2018, then members

10   would have had less than fifteen days to return the ballots, in violation of LMRDA.

11        Thus, the exact date the ballots arrived in Panama is relevant to DOL's allegation that the

12   ballots were not timely received. DOL does not dispute ILWU's assertion that this information can

13   only be obtained from first-hand sources in Panama.

14                          c.    **Voting Instructions**

15        DOL alleges that, while the ballot return envelopes stated "NO POSTAGE NECESSARY

16   IF MAILED TO THE UNITED STATES," that information was not provided in Spanish. *Id.* ¶ 20.

17   Although DOL does not clearly state its argument, it appears to assert that some members may have

18   been disincentivized from voting because they believed they would have to pay to return the ballots.

19   ILWU argues that it needs Panamanian-based discovery to learn whether members were actually

20   disincentivized from voting because the envelopes did not have Spanish language instructions. Mot.

21   at 12. DOL responds that discovery in Panama is irrelevant to its allegation that ILWU unreasonably

22   failed to provide Spanish-language voting instructions because that information can be determined

23   simply by looking at the ballot return envelopes.

24        DOL's argument is not convincing. The absence of Spanish-language instructions on the

25   ballot envelopes is not enough to show whether any union members were otherwise informed of the

26   mailing requirements or actually believed they would be charged. If the Panama members knew

27

28   ───────────────
     [8] Salas told ILWU that the ballots started arriving in the Balboa post office on August 16, 2020, but
     some ballots did not arrive until later. *See* First Remar Decl., Ex. K.

1   from other sources, such as Panama postal workers or union officials, that they did not have to pay

2   postage, then failing to provide Spanish-language instructions to that effect on the ballot itself would

3   not affect what the members knew about the ballot return requirements.  Therefore, the members'

4   actual knowledge about the postage charge is relevant to DOL's allegation that ILWU failed to

5   provide adequate instructions about returning ballots.

6               **d.        Equitable Defense**

7          ILWU's unclean hands defense posits that a court is not required to void an election "in the

8   exceptional circumstances of this case in which an incumbent union faction intentionally violated

9   the LMRDA election rules, lost the election, and then complained to the Secretary in an effort to

10  undo the election results."  *Marshall v. Local 1010, United Steelworkers*, 664 F.2d 146 (7th Cir.

11  1981).  ILWU points out that Mitre, the ILWU liaison to Panama, was affiliated with the Familathe

12  campaign, and was the source of the SINTRAPORSPA voter list that ILWU relied on in sending

13  out ballots.  It also notes that Familathe supporters favored the general delivery process.  ILWU

14  argues that it is entitled to investigate whether Mitre or other members of the Familathe campaign

15  were responsible for the election irregularities in Panama.   It asserts that individuals in

16  SINTRAPORSPA will be able to provide information relevant to that inquiry, including why

17  SINTRAPORSPA certified that the membership list provided to the Convention was accurate and

18  why the Panama delegates to the Convention advocated for the general delivery process.  *See* Mot.

19  at 15.   The court acknowledges that if Familathe and/or his supporters collaborated with

20  SINTRAPORSPA officials to undermine the integrity of the 2018 election, the officials in Panama

21  likely have information about their involvement.   However, as discussed further below, the court

22  denies the requested Panamanian discovery on this topic because it is not proportional, given the

23  lack of evidentiary support for the defense theory that Mitre or other Familathe campaign members

24  engaged in election misconduct in Panama.

25          In sum, the court finds that the information ILWU seeks in Panama is relevant to the claims

26  and defenses in this case.

27               **2.        Proportionality**

28          DOL argues that the proposed discovery is not proportional to the needs of the case because

13

1    (1) ILWU has not provided sufficient factual support for its proposed discovery; (2) ILWU has not

2    exhausted its discovery efforts in the United States: and (3) ILWU has not established good cause

3    for extending case deadlines, as will likely be required to complete the letters rogatory process.

4         As discussed above, DOL investigated the claims in its complaint through sources and

5    information in Panama.  ILWU is entitled to test the factual bases of DOL's allegations through its

6    own discovery and investigation.  The resolution of some of these issues, such as when the ballots

7    arrived in Panama and whether every eligible member received a ballot, requires information that

8    does not appear to be available from sources in the United States.  Further, ILWU has adequately

9    explained how such information is necessary to counter DOL's claims.  Therefore, at least some of

10   ILWU's proposed discovery is both relevant and proportional to the issues in this case.

11        However, in the hearing held on November 19, 2019, the court noted that ILWU's unclean

12   hands defense seemed "speculative so far."  *See* Docket No.56 at 24:22-23. It advised ILWU that

13   the union "need[s] to connect the dots better before [Panama discovery] becomes proportional." *Id.*

14   at 24:25-25:6.  The court observed that some of the information relevant to the unclean hands

15   defense would likely be in the United States, such as the testimony of Familathe and Mitre, and that

16   the depositions of those individuals should be completed before engaging in international discovery.

17   *Id.*  In the hearing on the current motion, the court again noted that there was little evidentiary

18   support for the equitable defense and that ILWU had not yet taken either Familathe's or Mitre's

19   deposition.  Accordingly, the court allowed ILWU to proceed with those depositions and file

20   supplemental briefing "on the narrow issue of whether ILWU has sufficient factual grounds to seek

21   additional information about its equitable defense" from sources in Panama.  [Docket No. 99.]

22        ILWU filed a supplemental brief on September 23, 2020 and attached portions of the

23   transcripts for Familathe's and Mitre's depositions as well as text messages between Mitre and

24   Salas.  Docket Nos. 109 ("ILWU Supp. Br."); 110, Second Declaration of Eleanor Morton ("Second

25   Morton Decl.").  It also attached two expert reports.  One of the reports concludes that the 1,079

26   ballots received from Panama were all filled out by a small group of one to four individuals.  The

27   other expert opines that the Panamanian ballots were anomalous when compared with the other

28   ballots cast in the 2018 election.  Second Morton Decl., Exs. S and T.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1         With respect to the supplemental deposition testimony, Mitre testified that he was in contact

2   with Salas about the voting process for members of SINTRAPORSPA but he (1) did not know

3   whether Salas was also in communication with Familathe at the time; (2) did not know whether

4   Salas was the person who picked up the ballots from the post office; (3) did not know whether the

5   membership list he provided from SINTRAPORSPA was accurate; (4) did not know whether

6   everyone who completed a ballot for SINTRAPORSPA was a member of the local at the time of

7   the election; and (5) has never talked with Salas about how the ballots were completed.  Second

8   Morton Decl, Ex. U, Deposition of Greg Mitre ("Mitre Depo.") at 110:13-18; 124:8-24; 136:11-20;

9   139:11-20; 141:9-13; 141:18-22.  Familathe similarly testified that he (1) did not know who was

10  responsible for tracking the membership of SINTRAPORSPA; (2) had no information about

11  whether the membership list provided by SINTRAPORSPA was correct; (3) never talked to Salas

12  about who picked up the ballots from the post office; and (4) did not know how the ballots were

13  collected or where they were filled out.  Second Morton Decl., Ex. Y, Deposition of Ray Familathe

14  ("Familathe Depo.") at 79:11:18; 79:20-80:17; 217:4-15; 219:13-21.  At most, the testimony shows

15  that Familathe and Mitre were in contact with Salas and were encouraging members of

16  SINTRAPORSPA to vote.  While ILWU says that these communications show "deep concern" by

17  the deponents that the Panama ballots were filled out and mailed, that is hardly surprising given that

18  Familathe and Mitre were campaigning in Panama.  Their testimony does not raise an inference that

19  their campaign activities were inappropriate.  *See* ILWU Supp. Br. at 3.  ILWU argues that

20  Familathe's and Mitre's *lack* of communication about certain topics, such as their failure to ask what

21  union officials were doing to "count and track the number of Panama ballots cast," is somehow in

22  itself suspicious, even though ILWU also admits that candidates would not normally be privy to this

23  information in a secret ballot election.  *Id.*  The text messages between Mitre and Salas also show

24  no sign of Mitre encouraging or condoning improper voting procedures.  In fact, Mitre asked Salas

25  several times how many members had filled out their ballots and told him "I hope everything is fine

26  and you get a lot of people participating!!"  *See* Second Morton Declaration, Ex. W at 14.  This

27  exchange does not suggest that Mitre knew or encouraged a small group of individuals to fill out all

28  the ballots.  While Mitre did ask Salas whether "everything [is] proceeding as planned," there is no

1  indication that the "plan" was anything other than to encourage voter participation.  *See id.* at 13.

2  In short, none of the additional evidence submitted by ILWU furthers their theory that Familathe's

3  campaign engaged in or encouraged election fraud.

4        Based on the above considerations, the court makes the following findings.  ILWU has

5  shown that there is information in Panama that is relevant to the claims and defenses in this case,

6  that the information is necessary to adequately respond to DOL's allegations, and that the

7  information sought is not available in the United States.  However, ILWU's requests are somewhat

8  overbroad.  First, ILWU has not adequately supported their request to depose multiple individuals

9  from SINTRAPORSPA and PCPU.  For example, ILWU requests depositions from

10  SINTRAPORSPA (in a manner similar to a 30(b)(6) deposition), Salas (the SINTRAPORSPA

11  Secretary of Defense) and Jimenez (the SINTRAPORSPA Secretary – Treasurer).  The information

12  sought from each of these deponents is nearly identical and thus duplicative.  Similarly, ILWU

13  requests depositions from PCPU, Rankin and Fueillet (PCPU officers and ILWU Convention

14  delegates), and Moreno (the PCPU Secretary General and an ILWU Convention delegate).  The

15  proposed discovery related to these deponents is also virtually identical.  According, the court finds

16  it appropriate to allow depositions from one SINTRAPORSPA representative, one PCPU

17  representative, and one representative from each of Panama Ports and Serviestiba, S.A., the

18  employers of dock workers who were members of SINTRAPORSPA.  Given ILWU's sparse

19  evidence relating to its unclean hands theory, ILWU's request to take discovery in Panama on that

20  topic is denied.

21        Further, the court has narrowed the scope of the permissible deposition topics to those

22  directly relevant to the claims and defenses in the case.[9]  The modifications are reflected in the

23  amended letters rogatory that the court will issue separately.  ILWU's document requests have been

24  similarly narrowed.

25

26

27      [9] For example, ILWU requests information relating to the past three elections of SINTRAPORSPA members.  At the hearing, ILWU did not make a satisfactory showing that the past three

28  SINTRAPORSPA elections are relevant to DOL's allegations or ILWU's defenses, and such discovery is overbroad and not proportional to the needs of this case.

III.    CONCLUSION

For the reasons stated above, ILWU's motion for issuance of letters rogatory is granted in part and denied in part.  The court will sign and affix its seal to the letters rogatory as amended by the court and will return the letters to ILWU's counsel for forwarding to the United States Department of State.

        **IT IS SO ORDERED.**

Dated: November 18, 2020



Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California